Filed 5/29/14

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

<table>
<tr><td>THE PEOPLE,<br><br>     Plaintiff and Respondent,<br>v.<br>CAMERON ROSE,<br><br>     Defendant and Appellant.</td><td>A135974<br><br>(Alameda County<br>Super. Ct. No. 168323)</td></tr>
</table>

Cameron Rose hit an Oakland police officer with a folding chair during a confrontation between officers and participants in a "teepee vigil" on Frank Ogawa Plaza (the plaza), and he was arrested about a month later. He was charged with two felony counts arising out of the folding-chair incident: resisting an executive officer and assault with a deadly weapon on a peace officer. He was also charged with one misdemeanor count arising out of his subsequent arrest: resisting, obstructing, or delaying a peace officer.[1] On the charges arising out of the folding-chair incident, a jury convicted Rose of resisting an executive officer and acquitted him of felony assault, instead convicting him of the lesser included offense of misdemeanor assault on a peace officer under section 241, subdivision (c). On the charge arising out of Rose's subsequent arrest, the jury was unable to return a verdict, and a mistrial was declared.

---

[*] This opinion is certified for publication with the exception of part II.A. (California Rules of Court, rules 8.1105(b) and 8.1110.)

[1] The first felony charge was brought under Penal Code section 69, the second felony charge was brought under Penal Code section 245, subdivision (c), and the misdemeanor charge was brought under Penal Code section 148, subdivision (a)(1). All further statutory references are to the Penal Code unless otherwise noted.

1

On appeal, Rose argues that the trial court improperly (1) denied his *Pitchess*[2] motion for discovery of the personnel files of several police officers; (2) denied his motion to compel the prosecution to run rap sheets[3] of the officers who testified against him; and (3) imposed a probation condition prohibiting him from entering the plaza and a small area around it. We reject Rose's claims, except we conditionally reverse the judgment and remand for limited further *Pitchess* proceedings involving one officer.

I.
FACTUAL AND
PROCEDURAL HISTORY

In late November 2011, the City of Oakland issued a permit authorizing a teepee vigil on the plaza. The vigil was closely associated with Occupy Oakland, a protest movement. The permit authorized placing a teepee on the plaza, but it also prohibited a variety of activities, such as serving food and storing items. The permit was renewed a number of times over the next month, and it was in effect on December 30, 2011.

While in the plaza around 11:30 a.m. on December 30, Captain Jeffrey Israel noticed that various items, including bedding, clothing, coolers, and chairs, were blocking the walkways. He spoke to Naomi Reagan, a person associated with the vigil. Acting on directions from the chief of police, Captain Israel informed Reagan that all items not allowed by the permit had to be removed by 2:00 p.m. that day. Reagan asked for more time to comply, but Captain Israel insisted that the items had to be gone by 2:00 p.m. After overhearing the conversation between Reagan and Captain Israel, a group of men, including Rose, yelled at Captain Israel and approached him aggressively. Captain Israel left, and the men eventually stopped shouting.

Around 2:00 p.m., a group of approximately 20 officers arrived at the vigil area. Many unpermitted items were still scattered around, and Sergeant Bernard Ortiz believed this violated the Oakland Municipal Code's prohibition against "minor encroachments without a permit." He ordered his officers to begin writing citations for the infractions.

---

[2] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

[3] The term "rap sheet" is a colloquialism for record of arrests and prosecution.

2

One of the officers, Officer Marcos Campos, thought that Carly Bate, a vigil participant, was violating the Oakland Municipal Code because "[s]ome of her property was [protruding] onto the walkway of [the p]laza," even though she began moving it after officers said they were going to start writing citations. She refused to give Officer Campos her identification or her name and date of birth. Bate began to walk away, and Officer Campos believed she was trying to flee and therefore subject to arrest.[4] He tried to handcuff her but was unsuccessful because she was "fla[il]ing her arms." He then felt someone else tug on his arm, and the handcuffs fell to the ground. An officer standing next to Officer Campos, Officer C. O'Connor,[5] grabbed Bate's other arm and handcuffed her.

Another officer present at the scene, Officer Patrick Gerrans (P. Gerrans),[6] corroborated Officer Campos's testimony. He testified that he and the other officers had been briefed that the vigil participants had been warned to remove their things from the plaza and that they should cite the participants who refused to comply. He testified that he observed Officer Campos, who was about six feet away, trying to get Bate's identification while Bate argued with him. Officer P. Gerrans saw Bate begin to walk away and then saw Officer Campos grab and "hold[] on to . . . Bate, which [Officer P. Gerrans] recognized as a detention." Officer P. Gerrans also saw Bate begin to move her arms in an attempt to resist being handcuffed.

Officer P. Gerrans and Sergeant Ortiz testified that the confrontation escalated as Bate was being restrained. They saw another woman, Tiffany Tran, intervene in the scuffle between Officer Campos and Bate. They both saw Tran grab Officer Campos from behind, and Officer P. Gerrans saw Tran grab Bate and try to pull her away from

---

[4] Testimony was presented that although a person generally is not subject to arrest for committing an infraction, an arrest may be proper if the person refuses to cooperate with the citation process.

[5] Officer O'Connor did not testify at trial, and his full name does not appear in the record.

[6] We refer to this officer by his initial to avoid confusion because his brother, Officer Robert Gerrans (R. Gerrans), is mentioned later in the opinion.

3

Officer Campos. Officer P. Gerrans responded by grabbing Tran's left arm, and Sergeant Ortiz responded by grabbing her right arm. Another bystander, Phillip Boswell, then "grabbed on to . . . Tran and tried to pull her away from" the officers. Boswell attempted to escape, and Sergeant Ortiz followed him.

While Officer P. Gerrans was still holding Tran's arm, intending to handcuff her, he was struck from behind. He felt a "dull thud to the middle part of [his] back" and "a sharp pain near the bottom of [his] head." He turned around and saw Rose pull a "steel folding chair . . . toward [Rose's] body, . . . [¶] . . . and throw it on the ground." Officer P. Gerrans testified that when he saw Rose with the chair, "it became very clear" that Rose had hit him with it because the impact felt like a large, "hard object," not a punch. Rose then picked up another "identical" chair "like a baseball player would hold up a bat, like they're getting ready to hit a pitch," and he threw it at Officer P. Gerrans's legs and fled. Neither Sergeant Ortiz nor Officer Campos, the only other officers present during the incident who testified at trial, witnessed Rose's attack on Officer P. Gerrans.

An arrest warrant was issued for Rose, and approximately a month later he was arrested by Officer Mario Bonilla. Rose's alleged actions during the arrest by Officer Bonilla formed the basis of the misdemeanor charge of resisting, obstructing, or delaying a peace officer. We do not discuss the facts surrounding the arrest because they are irrelevant to this appeal in light of the mistrial declared on this charge.

Three rulings by the trial court—two before the trial and one after—give rise to Rose's appeal. First, Rose challenges the court's denial of his *Pitchess* motion. The pretrial motion requested discovery of information in the personnel files of Officers P. Gerrans, Bonilla, R. Gerrans, O'Connor, and Campos. The court summarily denied the motion as to all the officers except P. Gerrans. It then conducted an in camera review of selected documents from Officer P. Gerrans's personnel file and determined that none of the documents were subject to disclosure.

Rose also challenges the denial of his pretrial motion to compel the prosecution to run a rap sheet for every police witness. Although the prosecution acknowledged it had a duty to disclose any material information about an officer's criminal history that a rap

4

sheet would reveal, a representative from the Alameda County District Attorney's office testified that the office had an alternative procedure for ensuring that such information was identified and turned over to the defense. The trial court denied Rose's motion on the basis that the court could not compel the prosecution to obtain information about officers' criminal history in a particular manner.

The final ruling Rose challenges involves a probation condition. After Rose was convicted, the trial court suspended imposition of his sentence and granted probation for five years. In doing so, the court imposed a condition that Rose stay out of an area of downtown Oakland that includes the plaza and City Hall (the stay-away condition). After Rose filed a motion challenging the stay-away condition, the court significantly reduced the restricted area but refused to strike the condition entirely because the court found it was necessary for Rose's successful completion of probation.

Rose timely appealed.

## II.
### DISCUSSION

A. *Further* Pitchess *Proceedings Are Required as to Officer P. Gerrans, but the Trial Court's Denial of Rose's* Pitchess *Motion as to the Remaining Officers Was Harmless.*

Rose's *Pitchess* motion sought "discovery as to prior acts of fabrication and/or misstatement of facts[,] . . . the fabrication of charges and/or evidence[,] and the authoring [of] or acquiescing to false or misleading police reports" by Officers P. Gerrans, Bonilla, R. Gerrans, O'Connor, and Campos. The motion also sought "discovery as to any acts of aggressive behavior, violence or attempted violence, and/or excessive force or attempted excessive force" by Officer Bonilla and "discovery as to acts involving illegal search and seizure" by Officers O'Connor and Campos. The trial court summarily denied the motion as to all the officers except Officer P. Gerrans, concluding that the discovery sought was "[n]ot material." The court granted "[t]he motion for discovery of reports of complaints regarding false reports, fabrication of evidence, et cetera, as to Officer [P.] Gerrans. . . . That will sort of sweep up and include

5

any allegations of false arrest, making up charges, things like that, which basically involve[] dishonesty and it's the same thing as fabrication."

In accordance with *Pitchess* procedures, a police records custodian brought to court records from Officer P. Gerrans's personnel file that the custodian considered responsive to the discovery request. The custodian also provided a declaration that generally described other documents in the personnel file that the custodian considered nonresponsive to the request. After conducting an in camera review of the documents provided, the trial court determined that none of them were subject to disclosure because "[t]hey [did]n't fall within the scope of the order." It also ordered that the custodian's declaration be filed under seal.

Rose argues that the trial court erred by summarily denying his *Pitchess* motion as to the officers other than Officer P. Gerrans, and he asks us to independently review the in camera hearing at which the court evaluated the documents selected by the custodian from Officer P. Gerrans's personnel file. For reasons we explain below, we conclude that (1) any error in the court's denial of the *Pitchess* motion as to the officers other than Officer P. Gerrans was harmless, and (2) the court properly exercised its discretion in determining that the documents the custodian selected from Officer P. Gerrans's personnel file were not subject to disclosure. But we cannot tell from the record whether the court reviewed the custodian's declaration to ensure that the *unselected* documents were not potentially relevant. Accordingly, we remand the matter for the court to conduct such a review.

1.      The procedure for considering *Pitchess* motions.

In *Pitchess*, *supra*, 11 Cal.3d 531, our state Supreme Court held that "a criminal defendant [can] 'compel discovery' of certain relevant information in the personnel files of police officers by making 'general allegations which establish some cause for discovery' of that information and by showing how it would support a defense to the charge [or charges] against him." (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1018-1019.) This holding was later codified in sections 832.5, 832.7, and 832.8 and Evidence Code sections 1043 through 1047. (*People v. Mooc* (2001) 26 Cal.4th 1216,

6

1226 (*Mooc*); see also *Warrick*, at p. 1019.)  *Pitchess* and the resulting statutory scheme attempt to balance a criminal defendant's "due process right to a fair trial" with an officer's "strong privacy interest in his or her personnel records."  (*Mooc*, at p. 1227.)

To obtain discovery of an officer's personnel records, a defendant must file a motion that includes an affidavit establishing "good cause" for discovery of the records.  (Evid. Code, § 1043, subd. (b)(3).)  Establishing good cause requires that the affidavit "propose a defense or defenses to the pending charges" and "articulate how the discovery sought may lead to relevant evidence or itself may be admissible direct or impeachment evidence [citations] that would support those proposed defenses."  (*Warrick v. Superior Court*, *supra*, 35 Cal.4th at p. 1024.)  A "showing of good cause is a 'relatively low threshold for discovery.' "  (*Id.* at p. 1019.)

If the trial court concludes that good cause is lacking, the motion is summarily denied.  (See *People v. Gaines* (2009) 46 Cal.4th 172, 176.)  But if good cause is found, the court conducts an in camera hearing to review the officer's personnel file.  The custodian of records must bring all " 'potentially relevant' " records for the court's review (*Mooc*, *supra*, 26 Cal.4th at p. 1226), be placed under oath (*People v. White* (2011) 191 Cal.App.4th 1333, 1340), and state for the record whether other documents in the personnel file "were deemed irrelevant or otherwise nonresponsive" and, if so, why. (*Mooc*, at p. 1229.)  The court then determines, subject to a variety of limitations and exceptions, whether any of the proffered documents are relevant and should be disclosed. (*Ibid.*; see Evid. Code, § 1045, subds. (a), (b).)

To enable appellate review, the trial court "should . . . make a record of what documents it examined before ruling on the *Pitchess* motion," whether by retaining copies of the documents or identifying them for the record.  (*Mooc, supra,* 26 Cal.4th at p. 1229.)  If the court does not make a record of the documents reviewed in camera or does not review the documents at all, the judgment should be conditionally reversed and the matter remanded for further *Pitchess* proceedings.  (*People v. Gaines*, *supra*, 46 Cal.4th at pp. 180-181.)

7

2.     Any error in the trial court's denial of the motion as to the officers other than P. Gerrans was harmless.

We review the trial court's summary denial of Rose's motion as to the officers other than P. Gerrans for an abuse of discretion. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 992.) To prevail, Rose must establish not only "good cause" for discovery of the records but also "a reasonable probability of a different outcome had the evidence been disclosed." (*People v. Gaines*, *supra*, 46 Cal.4th at p. 182.) We conclude that any error in the ruling was harmless under this standard.

In his briefing, Rose does not explain why the denial of the motion as to these four officers was prejudicial. Instead, he apparently believes that if the denial was erroneous, remand is required for an in camera review of the personnel files. But remand is not automatic whenever a trial court errs by summarily denying a *Pitchess* motion: an appellate court may deem the error harmless if, even assuming records favorable to the defense may have been discovered, there is no reasonable probability that the favorable evidence would have affected the trial's outcome. (See, e.g., *People v. Samuels* (2005) 36 Cal.4th 96, 109-110 [even if trial court erred in summarily denying *Pitchess* request for records of officer initially suspected in one of the crimes charged, "such error was harmless in light of the extensive evidence linking defendant" to that crime].)

We conclude that any error in the trial court's denial of the motion as to the officers other than P. Gerrans was harmless. To begin with, the denial of the motion as to Officer Bonilla was not prejudicial because, as the Attorney General points out, his testimony was relevant only to the misdemeanor charge of resisting, obstructing, or delaying a peace officer, and that charge resulted in a mistrial. Rose does not argue to the contrary.

The denial of the motion as to Officer R. Gerrans also was not prejudicial. Rose's *Pitchess* affidavit stated that Officer R. Gerrans had written a police report in which he corroborated Officer P. Gerrans's statement that earlier on the day of the folding-chair incident, Rose threatened to kill the officers' " 'whole . . . family' " after learning they were brothers. The affidavit claimed that the discovery sought was relevant to establish

8

that Rose did not make any such threat. Although we agree with Rose's general point that *Pitchess* discovery may be relevant to issues other than impeachment and may be available even when an officer does not testify, in this instance, impeachment was the only ground upon which discovery of Officer R. Gerrans's records was sought, and no evidence about the threat was introduced at trial.[7] Whether Officer R. Gerrans lied about the threat turned out to be inconsequential.

Similarly, the denial of the motion as to Officer O'Connor was not prejudicial because he did not testify at trial, and the evidence relating to him was of minimal relevance. Rose's only reason other than impeachment for seeking discovery of Officer O'Connor's records was to establish that Bate's arrest was unlawful, on the theory that Officer O'Connor "fabricated a basis to arrest [her]." It is true that the lawfulness of Bate's arrest was at issue: the jury was instructed that whether Officer P. Gerrans "was aware or reasonably should have been aware of facts and circumstances suggesting that [Bate's] arrest . . . was unlawful" could affect whether his attempt to arrest Tran was "within the lawful scope of his duties"—an element of both felony charges.[8] But Officer O'Connor's actions were of minimal relevance in determining the lawfulness of Bate's arrest. Officer Campos testified that he was the one who decided to cite Bate and then to arrest her once she began to leave. According to Officer Campos, Officer O'Connor did not talk to Bate and did not participate in her arrest until she was uncooperative and Officer Campos dropped the handcuffs. In addition, Officer P. Gerrans could not recall any participation by Officer O'Connor in Bate's arrest and testified that at the time of the incident he was focused on Bate and Officer Campos. Thus, any evidence of previous false arrests by Officer O'Connor would not have borne on whether Bate's arrest was lawful or whether Officer P. Gerrans believed the arrest was lawful.

[7] At the sentencing hearing, the parties stipulated "that Officer [P.] Gerrans be deemed to have been called to testify and that he would have testified" about Rose's threatening of the brothers' family and of other officers, and as discussed below, the trial court relied on this evidence in setting the conditions of Rose's probation.

[8] Neither party challenges this instruction on appeal, and we express no opinion as to whether it was legally correct.

Finally, the summary denial of the motion as to Officer Campos was also harmless, although we acknowledge this issue is closer. Rose's *Pitchess* affidavit sought the records of Officer Campos to impeach him and to establish that he "fabricated a basis to arrest . . . Bate." Officer Campos's testimony was relevant only to the issue of the lawfulness of Bate's arrest: he did not see anything that Tran or Rose did. Any evidence used to impeach Officer Campos could conceivably affect the trial's outcome only by undermining his testimony about the lawfulness of Bate's arrest, which the jury was instructed was "relevant only to the extent Officer [P.] Gerrans was aware or reasonably should have been aware of facts and circumstances suggesting that [Bate's] arrest . . . was unlawful."

Officer Campos's testimony about the lawfulness of Bate's arrest was not necessary to establish Rose's guilt, however, in light of Officer P. Gerrans's testimony. The defense's theory was that Bate's arrest was unlawful because the Oakland Municipal Code did not prohibit personal belongings on the plaza, Bate had already started to move her items when Officer Campos tried to cite her, and Bate was under no obligation to provide identification because the Penal Code allows a thumbprint or signature in lieu of identification. But Officer Campos's testimony did not bear on how to construe the Municipal Code or Penal Code, and Officer Campos conceded that Bate was carrying items when he tried to cite her. Nor was his testimony needed to establish that Officer P. Gerrans was acting within the lawful scope of his duties. Rather, Officer P. Gerrans's testimony alone sufficed to establish probable cause for arresting Tran: Officer P. Gerrans saw Officer Campos attempt to cite Bate, saw Bate attempt to leave and then resist Officer Campos's attempt to handcuff her, and saw Tran grab both Bate and Officer Campos. Under these circumstances, we conclude that a more favorable verdict was not reasonably probable even if Officer Campos's testimony had somehow been discredited.

3. Remand is required for the limited purpose of reviewing the declaration of the police custodian of records.

Rose requests that we review the transcript of the in camera hearing on Officer P. Gerrans's records to determine whether the trial court complied with the procedures required under *Mooc*, *supra*, 26 Cal.4th 1216 and whether it erred by finding there were no relevant documents to disclose. The Attorney General does not oppose the request.

Although the appellate record does not contain the records that the police custodian of records brought to court, the trial court described them in detail at the in camera hearing, and thus the transcript "is adequate for purposes of conducting a meaningful appellate review" of the determination that the records were not subject to disclosure. (*People v. Myles* (2012) 53 Cal.4th 1181, 1209.) As to these records, the court followed the proper procedures. It swore in the custodian, reviewed the personnel documents provided, and gave a detailed description of each of those documents for the record. We conclude that the court did not abuse its discretion in determining that the documents reviewed were not subject to disclosure.

But we are unable to determine whether the trial court reviewed and evaluated the custodian's declaration about the documents that were *not* brought to court. Under *Mooc*, "[t]he custodian should be prepared to state in chambers and for the record what other documents (or category of documents) not presented to the court were included in the complete personnel record, and why those were deemed irrelevant or otherwise nonresponsive to the defendant's *Pitchess* motion." (*Mooc*, *supra*, 26 Cal.4th at p. 1229.) "In addition, if it is not readily apparent from the nature of the documents that they are nonresponsive or irrelevant to the discovery request, the custodian must explain his or her decision to withhold them. Absent this information, the [trial] court cannot adequately assess the completeness of the custodian's review of the personnel files, nor can it establish the legitimacy of the custodian's decision to withhold documents contained therein." (*People v. Guevara* (2007) 148 Cal.App.4th 62, 69.)

Here, some of the records not brought to court are described in the custodian's declaration in a manner that leaves us unable to conclude that they were necessarily

11

nonresponsive to Rose's *Pitchess* motion. Since the record does not reflect that the trial court reviewed the declaration or inquired into why these records were deemed nonresponsive, we conclude that we must conditionally reverse the judgment and remand for further proceedings. (See *People v. Guevara*, *supra*, 148 Cal.App.4th at p. 69 [conditionally reversing and remanding where record did not show "that the trial court actually reviewed the list [of records deemed irrelevant] . . . submitted in support of the custodian of record's decision to produce no records for the court's examination"].)

B.      *The Trial Court's Refusal to Compel the Prosecution to Run Rap Sheets of the Officer Witnesses Did Not Violate Due Process.*

Rose argues that his convictions must be reversed because the trial court improperly denied his motion to compel the prosecution to run rap sheets of the officer witnesses. He contends that the court's ruling denied him due process under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) and under United States Supreme Court cases invalidating "asymmetrical application of the rules of evidence." We disagree with both contentions.

Rose's motion asked for the "felony record, or conduct amounting to moral turpitude," for "all police witnesses." At the hearing on the motion, the trial court construed the motion as a request for it to "order the District Attorney's office to run criminal [rap] sheets of prospective law enforcement witnesses in this matter."[9] The People opposed the motion, and in doing so provided the court with "some background for the respective position[s] of counsel" in the form of briefs from a writ proceeding in a different case in which the People challenged an order requiring them "to run the [rap] sheets of the relevant officers."

Jeffrey Rubin, a member of the Alameda County District Attorney's office's "*Brady* committee," testified about the office's procedures for ensuring that discoverable information about police-officer witnesses is turned over to the defense. He explained

---

[9] We are puzzled why Rose's motion was so interpreted, given that it did not even mention rap sheets. The prosecution never claimed that Rose was not entitled to the information the motion sought (if any such information existed), and the trial court did not so rule. The Attorney General, however, makes nothing of this discrepancy.

that the office "gather[s] information from a variety of different sources" about police officers and compiles this information in a "database" that members of the *Brady* committee consult when a prosecutor asks whether discoverable information exists about a particular officer. Although Rubin agreed that rap sheets are generally within the District Attorney's office's "constructive possession" and that information from an officer's rap sheet is discoverable if it is "relevant on the subject of credibility or some other relevant issue," he explained that the office policy was not to run a rap sheet as a matter of course for every officer. He stated that his office believed the "mechanism" he had described was "a more efficient . . . and more comprehensive . . . and . . . more ethical way of ensuring that [it] get[s] this information to the [d]efense, and that mechanism is not having to run a criminal history [rap] sheet for every officer in every case every time we have to prosecute a case."[10]

The trial court denied Rose's motion. Although the court expressed doubt that the District Attorney's office's procedure was "the most efficient" way of learning about police officers' criminal records and stated it "would run the [rap] sheets" if it were up to the court, it characterized the practice described by Rubin as "a good faith effort [by] the District Attorney's office to provide this information." The court ruled that due process did not require it to "micromanage . . . [the District Attorney's office's] exercise of [its *Brady*] obligation . . . [by] tell[ing it] exactly how [it] ha[d] to look [for the information]," i.e., by ordering it to run rap sheets.

---

[10] After ruling on the motion, the trial court permitted Rubin, for the purpose of making a record, to provide additional testimony in camera about the particular ways in which the District Attorney's office acquires information about police officers.

1. **The prosecution cannot be forced to comply with its *Brady* duty to investigate in a particular manner.**

Rose argues that the trial court abused its discretion in refusing to order the prosecution to run the police officers' rap sheets because "[t]he prosecution has a duty to obtain the criminal history information contained in the rap sheets" under *Brady*, *supra*, 373 U.S. 83, and the District Attorney's office's procedures for acquiring evidence favorable to the defense are inadequate. Although we confirm that the prosecution has a duty under *Brady* to learn of material impeachment evidence within its actual or constructive possession, we reject the contention that a defendant can force the prosecution, through a discovery motion, to discharge this duty by running an officer's rap sheet.

Initially, we observe that Rose is not attempting to establish a traditional *Brady* violation, nor could he. " 'There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' " (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042-1043, quoting *Strickler v. Greene* (1999) 527 U.S. 263, 281-282.) Here, there is no "evidence at issue" because Rose has failed to show that any of the testifying officers have a criminal history. Mere speculation that such information might exist and might not have been disclosed is insufficient to establish a violation of *Brady*. (See *People v. Mena* (2012) 54 Cal.4th 146, 160 ["*Brady* merely serves ' "to restrict the prosecution's ability to *suppress* evidence rather than to provide the accused a right to criminal discovery," ' " italics in original].) And since Rose has not shown that any such information exists, he has necessarily failed to show that it was favorable to him, that it was suppressed, or that he suffered any prejudice.

Rather than asserting a traditional *Brady* claim, Rose instead argues that the trial court wrongly denied his motion because he was entitled to compel the prosecution to comply with its *Brady* duty to investigate possible exculpatory or impeachment evidence in a particular manner: by running the officers' rap sheets. We are not convinced.

14

A prosecutor's duty under *Brady*, *supra*, 373 U.S. 83 has been summarized by our state Supreme Court. "In *Brady*, the United States Supreme Court held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' [Citation.] The high court has since held that the duty to disclose such evidence exists even though there has been no request by the accused [citation], that the duty encompasses impeachment evidence as well as exculpatory evidence [citation], and that the duty extends even to evidence known only to police investigators and not to the prosecutor [citation]. . . . In order to comply with *Brady*, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.' [Citations.]" (*People v. Salazar*, *supra*, 35 Cal.4th at p. 1042; see also *In re Brown* (1998) 17 Cal.4th 873, 882 [prosecution has duty under *Brady* to learn of information that is " 'readily available' " to it].) " 'Conversely, a prosecutor does not have a duty to disclose exculpatory [or impeachment] evidence or information to a defendant unless the prosecution team actually or constructively possesses that evidence or information. Thus, information possessed by an agency that has no connection to the investigation or prosecution of the criminal charge against a defendant is not possessed by the prosecution team, and the prosecutor does not have the duty to search for or to disclose such material.' " (*In re Steele* (2004) 32 Cal.4th 682, 697.)

The prosecution in this case therefore had a duty under *Brady*, *supra*, 373 U.S. 83 to learn of any material impeachment information about the officer witnesses that was within the prosecution's constructive possession. " 'In general, impeachment evidence has been found to be material where the witness at issue "supplied the only evidence linking the defendant[] to the crime," [citations], or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case, [citations].' " (*People v. Salazar*, *supra*, 35 Cal.4th at p. 1050.) Although rap sheets themselves are not discoverable (*People v. Santos* (1994) 30 Cal.App.4th 169, 177), some information about a witness's criminal history that is included on a rap sheet may meet

15

*Brady*'s standard of materiality depending on the circumstances of a given case. (See, e.g., *People v. Little* (1997) 59 Cal.App.4th 426, 434 [prosecution has duty under *Brady* "to disclose the felony convictions of all material prosecution witnesses if the record is 'reasonably accessible' "].) We need not decide here whether such information about an officer witness is necessarily within the prosecution's constructive possession because the prosecution conceded both that it had constructive possession of information on rap sheets and that it had a corresponding duty of disclosure.

Even when material information is within the constructive possession of prosecutors, *Brady*, *supra*, 373 U.S. 83 does not empower a defendant to compel the precise manner by which prosecutors carry out their duty to learn of it. The trial court here declined to order the prosecution to run the officer witnesses' rap sheets, but it did not deny that Rose was entitled to discovery of the criminal-history information sought. Rose argues that the court abused its discretion because there was no showing that the District Attorney's procedure is "an adequate alternative means of obtaining the information contained in the rap sheets," but he provides no authority suggesting such a showing is required.[11] District attorneys need some mechanism for ensuring that they learn of *Brady* material within their constructive possession. (See *Giglio v. United States* (1972) 405 U.S. 150, 154 [recognizing prosecutors' burden to learn of information within their constructive possession and noting that "procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it"].) But the choice of that mechanism is within district attorneys' broad "discretionary powers in the initiation and conduct of

---

[11] In making his argument, Rose also cites state decisions which have held that under some circumstances a defendant is entitled to discovery of information about a witness's criminal history to which the prosecution has access, including felony convictions (*Hill v. Superior Court* (1974) 10 Cal.3d 812, 819-820), misdemeanor convictions (*People v. Santos*, *supra*, 30 Cal.App.4th at pp. 178-179), and pending charges (*People v. Coyer* (1983) 142 Cal.App.3d 839, 842). Like *Brady*, however, these cases require only that certain information be provided to the defense, not that a particular method be used to learn whether such information exists.

criminal proceedings," which "extend from the investigation and gathering of evidence relating to criminal offenses [citation], through the crucial decisions of whom to charge and what charges to bring, to the numerous choices the prosecutor makes at trial regarding 'whether to seek, oppose, accept, or challenge judicial actions and rulings.' " (*People v. Eubanks* (1996) 14 Cal.4th 580, 589.)  As such, that choice "generally is not subject to supervision by the judicial branch."  (*People v. Birks* (1998) 19 Cal.4th 108, 134.)  Rose fails to persuade us that the court erred in declining to compel the prosecution to run the officers' rap sheets.

Although we conclude that defendants cannot use discovery motions to compel prosecutors to run rap sheets, we point out that prosecutors who investigate witnesses' criminal histories through mechanisms other than running rap sheets risk a future *Brady* challenge if favorable information is later uncovered that would have been revealed on a rap sheet.  Prosecutors have the discretion to learn of evidence favorable to the defense through the methods they consider to be appropriate, but a *Brady* claim may lie if a defendant is prejudiced because a prosecutor failed to obtain favorable evidence that was readily available by running a rap sheet.  And this will be true regardless whether the prosecutor acted in good faith or actually knew about the evidence that was not disclosed. (*Kyles v. Whitley* (1995) 514 U.S. 419, 438; *People v. Williams* (2013) 58 Cal.4th 197, 256.)  "If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor."  (*United States v. Agurs* (1976) 427 U.S. 97, 110.)

       2.     Rose has not established that an "asymmetrical application of the rules of evidence" denied him due process.

Before trial, the People moved to be provided with the defense's witness list, the witnesses' "names [and] dates of birth," "and the opportunity to check [the witnesses'] criminal records."  Characterizing the request as "essentially a request for a witness list, and I think we have had that already," the trial court granted the motion without objection by Rose's counsel.  Rose argues that the court's denial of his motion to compel the prosecution to obtain the police officers' rap sheets "while ordering the defense to

17

provide information needed to obtain the rap sheets of defense witnesses was the functional equivalent of an asymmetrical application of the rules of evidence" and violated due process. We disagree.

The gist of Rose's argument is that he was "effectively precluded . . . from impeaching the officers with prior criminal conduct" while the prosecutor was allowed to obtain "similar impeachment evidence regarding defense witnesses." But the parties generally agree that Rose was entitled to receive information about the officers' criminal history. The prosecution never claimed that it had, or could have, impeachment information that it was not required to disclose to Rose. Because there has been no showing that the prosecution had access to any impeachment evidence that Rose did not have access to, the decisions upon which Rose relies are distinguishable to the extent they have any applicability at all. (See *Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 42-43, 57 & fn. 14 [under *Brady*, defense entitled to disclosure of information in state agency's child-abuse investigation file where statute made file confidential but permitted disclosure to "law-enforcement and judicial personnel"]; *Green v. Georgia* (1979) 442 U.S. 95, 97 [exclusion of hearsay statement in death-penalty trial violated due process because it was "highly relevant to a critical issue in the punishment phase of the trial, . . . and substantial reasons existed to assume its reliability," including that the state had introduced it in another trial]; *Washington v. Texas* (1967) 388 U.S. 14, 22 [rule permitting accomplices to testify for prosecution but not defense violated right to compulsory process].) We fail to see how the trial court's refusal to force the prosecution to run the officers' rap sheets constitutes "an asymmetrical application of the rules of evidence" that denied Rose due process.

C.      *The Stay-Away Probation Condition Was Narrowly Tailored and Designed to Promote Rose's Rehabilitation.*

Finally, Rose argues that the stay-away probation condition is unreasonable and unconstitutionally overbroad. We disagree and conclude that it was narrowly tailored to promote Rose's rehabilitation.

18

As orally pronounced by the trial court,[12] this condition required Rose to "stay out of an area in downtown Oakland. And that is completely out of it. It's not lawful business. It's out of the area that is bounded by [Interstate] 980 on the west, Grand Avenue on the north, 14th Street on the south, and Broadway on the east." The court reasoned, "I certainly understand Mr. Rose's commitment to the issues that he and his fellows were supporting that day, but in my view he has forfeited that right for the period of his probation to be within that area. He can express his views on those issues wherever he wants to anywhere else in the world, but for the period of probation[,] in order to ensure successful completion of probation[,] he's to stay out of that area."

Rose moved to modify or strike the stay-away condition. He argued that it was overbroad and unconstitutional because it restricted his right to travel and his ability to engage in political activity in a large part of downtown Oakland. At the hearing on the motion, the trial court modified the condition significantly. It reduced the stay-away area by changing the western boundary to Clay Street and the northern boundary to 17th Street, cutting the area to "about 15 percent of what it used to be." And it permitted Rose to pass through the prohibited area on certain modes of public transportation. As modified, however, the condition still prevents Rose from going to City Hall and the plaza.

Although the trial court agreed that the stay-away condition touched upon Rose's constitutional rights, the court disagreed that it "meaningfully hamper[ed] . . . those rights." It found that barring Rose from the stay-away area would help him avoid further unlawful activity. In the stay-away area, Rose had physically assaulted Officer P. Gerrans and, as we mentioned in the nonpublished portion of this opinion, had threatened to kill the officer's family and other police officers. The stay-away area was the "focal point" of unrest during Occupy Oakland, and Rose's offenses directly related to his participation in that movement. The court was particularly concerned, in light of

_____

[12] We look at the trial court's "more inclusive oral pronouncement" of the condition because neither party argues that the court's written probation order should control. (*People v. Freitas* (2009) 179 Cal.App.4th 747, 750, fn. 2.)

19

Rose's admitted mental illness, that Rose might be unable "to successfully complete probation" if he were allowed in the stay-away area.

"In granting probation, courts have broad discretion to impose conditions to foster rehabilitation and to protect public safety pursuant to . . . section 1203.1." (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1120.) "[T]he trial court's discretion, although broad, nevertheless is not without limits: a condition of probation must serve a purpose specified in the statute. In addition, . . . probation conditions which regulate conduct 'not itself criminal' [must] be 'reasonably related to the crime of which the defendant was convicted or to future criminality.' " (*Id.* at p. 1121.)

When a probation condition imposes limitations on a person's constitutional rights, however, a stricter standard applies. (See *People v. Olguin* (2008) 45 Cal.4th 375, 379-380, 384.) Such a condition " 'must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad.' " (*Id.* at p. 384.) "A court may not issue broad restraints on liberty that are completely unrelated to the defendant's crime, conduct[,] and future criminality, without a showing justifying the need for the restriction." (*People v. Perez* (2009) 176 Cal.App.4th 380, 384 (*Perez*).) Although Rose does not clearly explain how the probation condition hampers the exercise of his constitutional rights, we conclude that the condition is valid even under this stricter standard.

Rose primarily relies on *Perez*, *supra*, 176 Cal.App.4th 380, in which the Court of Appeal found unconstitutionally overbroad a probation condition that prohibited a defendant convicted of robbery from attending any court hearing or being within 500 feet of any court unless he was a defendant or under subpoena. (*Id.* at p. 382.) The Court of Appeal agreed with the defendant that the condition was not narrowly tailored to promote rehabilitation and that it unreasonably restricted his constitutional right to access the courts and government offices. (*Id.* at p. 385.) It reasoned that "the prosecution did not provide a rationale for the 500-foot court access restriction. It did not claim that Perez had loitered on courthouse property, that he had threatened or would threaten witnesses, or that his presence in a courthouse would incite violence." (*Id.* at p. 384.) The court

20

struck the condition and remanded the matter to the trial court for it to "impose a narrower condition if it deem[ed it] necessary." (*Id.* at pp. 385-386.)

*Perez*, *supra*, 176 Cal.App.4th 380 is distinguishable. First, unlike in *Perez*, the condition here was carefully designed to promote rehabilitation. The modified order limited the condition to an area of approximately six square blocks that was the site of Rose's offenses and the "focal point" of Occupy Oakland. After considering Rose's volatile and criminal history at that specific location as well as his mental illness, the trial court reasoned that restricting Rose from that small area would help him successfully complete his probation. Although Rose contends that the court's willingness to allow him to participate in protest activity outside the stay-away area is inconsistent with its reasoning, the court restricted Rose from only the specific area it found likely to trigger his unlawful behavior, emphasizing the condition's narrowness.

Second, in *Perez*, *supra*, 176 Cal.App.4th 380, the probation condition restricted the defendant's access to all courts even though his conviction was unrelated to courthouse property or being near a courthouse. (*Id.* at p. 383.) The Court of Appeal held that "broad and unnecessary exclusions from either government centers that invite public participation or public places that contain parks and other public forums touch upon other constitutionally protected interests" and "[*u*]*nreasonable* restrictions 'on access to public property' contravene the First Amendment." (*Id.* at p. 385, italics added.) In contrast, the condition here restricts Rose only from a small portion of Oakland directly related to the crimes he committed. It does not prevent him from entering government buildings or participating in protests outside of that area.

Rose also cites *In re White* (1979) 97 Cal.App.3d 141, in which the Court of Appeal granted relief to a defendant convicted of prostitution who, as a condition of her probation, was restricted from three designated " 'map areas' " in Fresno at all times and for any purpose. (*Id.* at pp. 143-144, 152.) The court held that the condition was unreasonable because it was "so sweeping and so punitive that it [became] unrelated to rehabilitation." (*Id.* at pp. 147-148.) The court's holding was based on the condition's restriction on the defendant's constitutional right to travel. (*Id.* at pp. 150-151.) Rose

21

does not explain how the condition here impermissibly hampers his right to travel, and it is hard to imagine how it might since the trial court modified the condition to allow him to travel through the restricted area on certain modes of public transportation. We conclude that the stay-away condition is narrowly tailored to its purposes and decline to strike it.

## III.
### DISPOSITION

The judgment is conditionally reversed, and the matter is remanded to the trial court with directions to hold another in camera hearing to review the declaration submitted by the police custodian of records. The judgment shall be affirmed unless the court finds that additional records should have been produced that contain discoverable information and " 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " (*People v. Hayes* (1990) 52 Cal.3d 577, 612.)

_____
Humes, J.

We concur:


_____
Ruvolo, P. J.


_____
Rivera, J.

22

Trial Court:                    Alameda County Superior Court

Trial Judge:                    Honorable Thomas Reardon

Counsel for Appellant:          Robert Bryzman, under appointment by the First
                                District Appellate Project

Counsel for Respondent:         Kamala D. Harris, Attorney General, Dane R. Gillette,
                                Chief Assistant Attorney General, Gerald A. Engler,
                                Senior Assistant Attorney General, Jeffrey M.
                                Laurence, Supervising Deputy Attorney General,
                                Arthur Beever, Deputy Attorney General